UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# ORIGINAL
D+F
C|M

------------------------------------------------------------x

RICARDO GUZMAN,

              Petitioner,

   -against-

GARY GREENE, Warden,

              Respondent.

------------------------------------------------------------x

**MEMORANDUM & ORDER**
No. CV-05-1599 (FB) (VVP)

*Appearances:*

| *For the Petitioner:* | *For the Respondent:* |
|---|---|
| RICARDO GUZMAN, *Pro Se* | CAMILLE O'HARA GILLESPIE, ESQ. |
| 00A5808 | Kings County District Attorney's Office |
| Great Meadow Correctional Facility | 350 Jay Street, Renaissance Plaza |
| P.O. Box 51 | Brooklyn, NY 11201 |
| Comstock, NY 12821-0051 | |

**BLOCK, Senior District Judge:**

On September 19, 2000, petitioner, Ricardo Guzman ("Guzman"), following a jury trial in New York Supreme Court, Kings County, was acquitted of intentional murder but convicted of depraved-indifference murder;[1] he was sentenced on October 10, 2000, to an indeterminate sentence of twenty-five years to life imprisonment. He now seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on the grounds that (A) the evidence supporting his conviction was legally insufficient; (B) the trial court improperly instructed

---

[1] The trial court instructed the jury that if it found the defendant guilty of either intentional murder or depraved-indifference murder it was not to consider the other count. *See* Tr. at 604. Nonetheless, the jury returned a verdict of not guilty with respect to intentional murder. *See* Tr. at 631-32.

1

the jury; (C) his inculpatory statements should have been suppressed as the fruits of an unlawful arrest, in violation of the Fourth Amendment; (D) the identification testimony violated his due process rights; and (E) his trial counsel was ineffective on various grounds. All claims were fully exhausted on direct appeal or in a proceeding under N.Y. Crim. Pro. Law § 440.10. *See People v. Guzman*, No. 5238-99 (N.Y. Sup. Ct. Nov. 28, 2003) (rejecting ineffective-assistance claim based on counsel's failure to raise the government's violation of the Vienna Convention on Consular Relations), *leave to appeal denied*, No. 04-00716 (2d Dep't Mar. 17, 2004); *People v. Guzman*, 778 N.Y.S.2d 893 (2d Dep't 2004) (rejecting remaining claims, including all other ineffective-assistance claims), *leave to appeal denied*, 3 N.Y.3d 706 (2004) (table).[2] For the reasons set forth below, Guzman's petition is denied, but a certificate of appealability is issued on the insufficiency-of-evidence claim.

## I.

Only federal issues may be raised on *habeas* review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a federal claim has been "adjudicated on the merits" by a state court, *habeas* relief may not be granted unless the state-court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[2] Guzman's application for leave to appeal was denied on September 24, 2004; thereafter, he moved for reargument, which was denied on February 9, 2005. *See People v. Guzman*, 4 N.Y.3d 799 (2005).

proceeding." 28 U.S.C. § 2254(d). A state-court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision involves an "unreasonable application" of clearly established federal law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *See id.* at 409. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

"When the state court fails to articulate the rationale behind its ruling, [the Court] must independently review the record and the applicable law." *Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (citations omitted). The decision must be upheld "unless [the Court's] independent review of the record and the pertinent federal law persuades [it] that [the state court's] *result* contravenes or unreasonably applies clearly established federal law,

or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 163 (emphasis added).

If, instead of reaching the merits, the state court denies a federal claim based on an "independent and adequate state procedural rule, federal *habeas* review of [the] claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The state court's reliance on such a rule, however, must be "clear from the face of the opinion." *Id.* at 735 (citation and quotations omitted). Thus, "when a state court uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000).

The degree of deference to be given to such a disjunctive state-court holding is "anything but clear." *Shih Wei Su v. Filion*, 335 F.3d 119, 125 - 26 & n.3 (2d Cir. 2003) (comparing *Ryan v. Miller*, 303 F.3d 231 (2d Cir. 2002) (giving AEDPA deference), with *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (declining to give AEDPA deference)). Until it is resolved by the Second Circuit, the issue can be avoided if the claim can be denied on *de novo* review. *See, e.g., Robinson v. Ricks*, 2004 WL 1638171, at *8 n.8 (E.D.N.Y. Jul. 22, 2004) (declining to decide whether AEDPA deference applied "because [petitioner's] claim . . . fails even under a *de novo* standard of review.").

4

The Court will apply AEDPA deference in reviewing Guzman's insufficiency-of-evidence claim because the Appellate Division rejected it on the merits, *see Guzman*, 778 N.Y.S.2d at 893; similarly, AEDPA deference is warranted in respect to Guzman's ineffective-assistance claim for failing to raise the Vienna Convention on Consular Relations ("VCCR") violation because the § 440.10 court denied it on the merits. *See Guzman*, No. 5238-99 at 2.[3] The Court will not apply AEDPA deference to Guzman's remaining claims, all of which were raised on direct appeal, and will review them *de novo* because the Appellate Division summarily ruled that they "[we]re unpreserved for appellate review, without merit, *or* d[id] not warrant reversal." *Guzman*, 778 N.Y.S.2d at 893 (emphasis added).

## II.

### A. Sufficiency of Evidence for Depraved-Indifference Murder

Guzman argues that there was insufficient evidence to convict him of depraved-indifference murder because the *only* reasonable view of the evidence was that he acted with an intent to kill – not with depraved indifference; if his argument proves successful, the result would be disturbing: Guzman could be set free; he could not be retried for intentional murder since he has been acquitted of that charge. *See Policano v. Herbert*, 430 F.3d 82, 93 (2d Cir. 2005) (noting that such a result, although "disturbing," was a necessary consequence of "keeping government and its servants in their place").

---

[3] The decision does not contain page numbers.

## 1. Facts

Guzman was charged with the murder of Phillip Menzies ("Menzies"). Viewing the evidence in the light most favorable to the prosecution, the following was established at trial:

Menzies's girlfriend testified that the following events transpired on June 30, 1999: She, her sister and Menzies were walking in McCaren Park when two men, each riding a bike, passed them. About three minutes later, the two bike-riders returned with a third bike-rider; one of the bike-riders asked Menzies, in Spanish, if he "ha[d] a problem?" and Menzies responded, also in Spanish, "never". Tr. at 20-21. Next, one of the bike-riders dismounted, threw his bike at Menzies and ran towards him; the other two bike-riders then also dismounted and also ran towards Menzies. The three bike-riders began to punch Menzies and a fistfight erupted, causing Menzies's girlfriend to intervene and punch one of the bike-riders; the other two bike-riders remained with Menzies. She then observed one of the men holding a knife and ultimately witnessed Menzies profusely bleeding. The medical examiner testified that Menzies died following three stab wounds – two in his chest that punctured his heart and left lung – and one in his back.

In a signed, written confession admitted at trial, Guzman substantially confirmed Menzies's girlfriend's account and admitted that he was the stabber. As stated therein, Guzman encountered Menzies when Guzman and two friends rode past him on their bikes. Guzman asked him "why [he was] staring at [him]?" and claimed that Menzies then "put his hands up to fight[,]" Tr. at 373; in response, Guzman threw his bicycle at him,

6

Menzies threw it back and they began to fistfight. In the course of the fistfight, Guzman observed Menzies take something out of his pants pocket; Guzman's friend then handed Guzman a knife and Guzman twice stabbed Menzies; Guzman then fled on his bicycle.[4]

In rejecting Guzman's insufficiency-of-evidence claim on the merits, the Appellate Division summarily stated that "[v]iewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Guzman*, 778 N.Y.S.2d at 893 (internal citation omitted).

## 2. Analysis

Under clearly established Supreme Court precedent, a conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A *habeas* petitioner challenging the sufficiency of the evidence supporting his conviction "bears a very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). He must show that the

---

[4] Although the recitation of facts includes only those facts necessary to present the evidence in the light most favorable to the prosecution, the Court notes that Menzies's girlfriend's sister and two other eyewitnesses also testified as to what transpired during the fight. Menzies's girlfriend's sister's testimony mirrored his girlfriend's testimony. One of the other eyewitnesses, Michael Huayamave ("Huayamave"), testified that he saw Guzman throw a bike at Menzies, who tried to throw it back towards Guzman but missed; Guzman and another individual then threw Menzies to the ground and Guzman then stabbed Menzies while the other individual punched Menzies. The other eyewitness, Nestor Moncayo, testified that he observed Guzman stab Menzies as Menzies was holding a bike.

verdict was so clearly against the weight of the evidence that "'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 839 (2d Cir. 1997) (quoting *Jackson*, 443 U.S. at 324). "State law determines the elements of a crime that must be supported by sufficient evidence to satisfy constitutional due process." *Policano*, 430 F.3d at 92 (internal citations omitted).

### a. Legal Requirements for Depraved-Indifference Murder

Under New York law, a defendant may be found guilty of depraved-indifference murder where, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."[5] N.Y. Penal Law § 125.25(2).

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

---

[5] Prior to 1965, depraved-indifference murder "embrace[d] those cases only where the act resulting in death is such as to imperil indiscriminately the lives of *many persons*, without being aimed at any one in particular[.]" *Darry v. People*, 10 N.Y. 120 (1854) (emphasis added). In 1965, the New York Legislature amended the definition of depraved-indifference murder to apply to one-on-one killings as well; since then, the definition has "remained essentially unchanged." *People v. Suarez*, --- N.E.2d ----, Nos. 178 & 179, slip op. at 3 (per curiam), *available at* 2005 WL 3488716 (Dec. 26, 2005).

*Id.* § 15.05(3).

**b. *Policano v. Herbert***

In *Policano*, the Second Circuit reiterated that under the law of New York an element of depraved-indifference murder is "that the defendant was indifferent to whether his or her acts would result in the victim's death[,]" 430 F.3d at 87, and therefore a defendant cannot be convicted of both depraved-indifference murder and intentional murder.

> One who acts intentionally in shooting a person to death – that is, with the conscious objective of bringing about that result ([N.Y.] Penal Law § 15.05[1]) – cannot at the same time act recklessly – that is, with conscious disregard of a substantial and unjustifiable risk that such a result will occur ([N.Y.] Penal Law § 15.05[3] ). The act is either intended or not intended; it cannot simultaneously be both.

*Id.* at 87-88 (quoting *People v. Gallagher*, 69 N.Y.2d 525, 529 (1987)).

Applying this principle, the court reversed a conviction for depraved-indifference murder where the defendant shot the victim at point-blank range, six days after the victim had attacked him with a pipe and after the defendant had vowed revenge. *See id.* at 89. The court explained:

> This evidence plainly supports a rational finding by the jury that [the defendant's] conscious objective [wa]s to cause [the victim's] death. As the district court pointed out, by shooting [the victim] three times in the head and neck, [the defendant] was not recklessly creating a grave risk of death, but was creating a virtual certainty of death born of an intent to kill.
>
> Conversely, the evidence does *not* support a rational finding by a jury that [the defendant's] firing of a nine-millimeter gun

9

three times into [the victim's] head and neck from close range was an act of conscious[ ] disregard of the risk that [the victim] would die as a result. There is no evidence in the record that [the defendant] meant to threaten or frighten [the victim], that the gun fired accidentally, or that [the defendant] acted otherwise than with the deliberate intent to kill.

*Id.* (emphasis in original; internal citations and quotations omitted).

However, the court noted that its "conclusion that the State's proof of intentional murder was inconsistent with proof of depraved-indifference murder rest[ed] on the *specific facts of th[at] case*," and contrasted *Policano* with three New York state cases "in which the evidence could have supported a finding of *either* intentional or depraved indifference murder." *Id.* at 90 (emphasis in original).

In the first such case, *People v. Tankleff*, 606 N.Y.S.2d 707 (2d Dep't 1993), *aff'd*, 84 N.Y.2d 992 (1994), defendant beat and stabbed both his mother and father; however, although he was convicted of the intentional murder of his father, he was convicted of the depraved-indifference murder of his mother. The circuit court noted, approvingly, that in upholding the depraved-indifference murder conviction, the Appellate Division determined that "the jury's conclusion was rational even if was not the one that the [state] court would have made; that is, even if the jury might well have decided on the same evidence that both murders were intentional."[6] *Policano*, 430 F.3d at 90.

In the second case, *People v. Sanchez*, 98 N.Y.2d 373 (2002), the court upheld a conviction for depraved-indifference murder in the face of a point-blank shooting, noting

---

[6] The New York Court of Appeals rejected Tankleff's insufficiency claim as "either meritless or unpreserved." *Tankleff*, 84 N.Y.2d at 995.

that "[t]he jury may also have taken into account the preexisting good relations between defendant and [the victim], and concluded that this was an instantaneous, impulsive shooting -- perhaps to disable or frighten [the victim], rather than to kill him." *Id.* at 377-78. The testimony was that the shooting happened after "harsh words were exchanged in a hallway near the foyer entrance" of the defendant's girlfriend's apartment shortly after the victim -- his friend -- implied that the defendant was unfaithful. *Id.* at 375. The defendant had come to his girlfriend's apartment, as did the victim and others, to celebrate the birthday of the girlfriend's three-year-old daughter. "From an adjoining room," someone heard the defendant and the victim "raise" their voices and "the sound of a scuffle," followed by the victim telling the defendant "to step outside." *Id.* An eyewitness observed the defendant "walking through the entrance doorway from the hallway where her two grandchildren were playing in the foyer, away from [the victim], who was behind the partially opened door." *Id.* at 375-76. Then the witness "saw defendant abruptly turn around, fire a gun pointed at [the victim's] chest and flee." *Id.* at 376. Forensic evidence established "that the gun was fired not more than 12-18 inches from [the deceased's] chest." *Id.*

Based on these facts, the court held that it was not inappropriate for the trial court to let the jury decide whether the defendant should be convicted of intentional or depraved-indifference murder. In that latter regard, it framed the issue as "whether, on this record, based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of causing death from defendant's conduct was so obviously

severe that it evinced a depraved indifference to human life[,]" and stated that "it was virtually a *knowing*, although not intentional, homicide." *Id.* at 384.

The court ultimately relied upon the following facts in holding that the jury could "reasonably have concluded that defendant's conduct was either reckless and depraved, or intentional," *id.* at 386:

> Defendant felt insulted by his victim, a person known to him; they were both celebrating the birthday of the three-year-old daughter of defendant's paramour. Instead of amicably settling their dispute, defendant -- with at least one other person (the eyewitness) in the hallway -- spontaneously turned, his arm came from around the door, he pointed the gun in the direction of the victim who was standing behind the door, and he pulled the trigger. The bullet hit the victim in the left upper chest and moved in a downward trajectory. Defendant fled.

*Id.* at 386-87.

Accordingly, the circuit court in *Policano* stated that "[w]e read *Sanchez*, like *Tankleff*, to hold that the evidence may be sufficient to support a conviction for depraved indifference murder if the jury could rationally infer that the defendant did not act with intent to kill the victim even if it might, on the same facts, properly conclude that the murder was intentional." *Policano*, 430 F.3d at 91.

In the third case, *Fama v. Commissioner of Corr. Servs.*, 235 F. 3d 804 (2d Cir. 2000), the circuit court "employed a similar approach in concluding that evidence at trial was sufficient to support a depraved-indifference murder conviction" where "the 'evidence demonstrate[d] that [the defendant] intended to *shoot* [the victim], but [did] not *necessarily*

12

show that he intended to *kill* him.'" *Policano*, 430 F.3d at 91 (quoting *Fama*, 235 F.3d at 812) (emphasis and alterations in original).

The present case, at first blush, would appear to present yet another factual setting, as in *Tankleff, Sanchez* and *Fama*, where the jury was permitted to choose between intentional and depraved-indifference murder. On the one hand, since Guzman fatally stabbed Menzies by plunging a knife into him at least two times, the jury could have concluded that this was consonant with an intent to kill. On the other hand, the facts have a *Sanchez*-like ring to them to justify the jury's finding of depraved-indifference murder: There was sufficient evidence that Guzman instigated a fight because of the manner in which Menzies had looked at him; that Guzman hastily stabbed Menzies in apparent self-defense; that there was no prior relationship between them; that Guzman had no motive -- other than the look -- to kill Menzies; and that the stabbing was impulsive in nature, without regard to its consequences, committed essentially to fend off Menzies. Under this view of the evidence, unlike *Policano*, the defendant, even if "recklessly creating a grave risk of death," was not "creating a virtual certainty of death born of an intent to kill." *Policano*, 430 F.3d at 89 (internal citation omitted).

Unfortunately, resolution of Guzman's insufficiency claim is not that simple because analysis of the New York Court of Appeals recent *per curiam* decision in *People v. Suarez*, --- N.E.2d ----, Nos. 178 & 179, slip op. at 3 (per curiam), *available at* 2005 WL 3488716 (Dec. 26, 2005), issued just a little over one month after *Policano* was decided, leads the Court to conclude that, although Guzman's 2000 conviction was sustainable under New York law

13

as of that time, it was not sustainable under the law when his direct appeal was decided in 2004. The Court also concludes that under the State's retroactivity rules, New York would not afford Guzman the benefit of the change in the law, and would apply the law as it was at the time he was convicted in 2000. The ultimate issue for federal *habeas* cases governed by AEDPA is whether there is clearly established Supreme Court law requiring the states to apply their criminal laws at the time of appellate review rather than at the time of conviction; if so, Guzman's petition would have to be granted. The Court addresses each of these issues in turn.

## c. The Law at the time of Conviction and at the time of Appellate Review

### i. *People v. Suarez*

*Suarez* is a curious *per curiam* since it spawned a joint concurring opinion by three of the seven judges of the court, a separate concurring opinion by another judge, and a part concurring, part dissenting opinion by yet another judge, befitting of the effort by the court to serve a quietus to the ongoing debate, reflected in its 4-3 decisions in *Sanchez* and *People v. Register*, 60 N.Y.2d 270 (1983), as to how to differentiate depraved-indifference murder from intentional murder or manslaughter.

Concerned that "[t]he proliferation of the use of depraved indifference murder as a fallback theory under which to charge intentional killers reflects a fundamental misunderstanding of the depraved indifference murder statute," and noting that "depraved indifference murder properly applies only to a small, and finite, category of cases where the conduct is at least as morally reprehensible as intentional murder[,]" the *per curiam* opinion

14

reversed the depraved murder convictions in the two cases before it -- *People v. Suarez* and *People v. McPherson* -- and, in the process, decided "for now and the future -- to revisit what is unique and distinctive about that crime as defined by the Legislature." *Suarez*, slip op. at 5-6 (per curiam).

The court began by noting that although the taking of the life of another "can itself, in a sense, be considered a 'depraved' act," it "does not, however, turn every killing into depraved indifference murder as proscribed by the Penal Law." *Id.* at 6. Rather,

> [t]o constitute depraved indifference, the defendant's conduct must be so wanton, so deficient in a moral sense of concern, so devoid of regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another. The vast majority of killings simply do not meet this standard. They are suitably punished by statutes defining intentional murder or manslaughter in the first or second degree or criminally negligent homicide.

*Id.* at 11 (internal citations and quotations omitted). Thus, as the court explained, "someone who intends to cause serious physical injury does not commit depraved indifference murder because the intended victim dies[,]" *id.*; rather, he "is guilty only of manslaughter in the first degree. Otherwise, every intentional manslaughter would also establish depraved indifference murder -- a result plainly at odds with the discrete classifications set forth in the statute." *Id.* at 12. Consequently, "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder." *Id.* (quoting *People v. Payne*, 3 N.Y.3d 266, 272 (2004)).

The court noted but two fact patterns that have recurred over the past four

15

decades since the revisions to New York's Penal Code where "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered." *Id.*

First, when the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die, the defendant's utter callousness to the victim's mortal plight-arising from a situation created by the defendant-properly establishes depraved indifference murder. Thus, in *People v. Kibbe*[, 35 N.Y.2d 407 (1974)], the defendants were properly convicted of depraved indifference murder after they robbed an intoxicated victim and forced him out of a car on the side of a dark, remote, snowy road, partially dressed and without shoes in subfreezing temperatures, where he was struck by a passing truck and killed. Similarly, in *People v. Mills*[, 1 N.Y.3d 269 (2003)], the defendant, without intent to harm or kill his victim, pushed a young boy into the water, watched him submerge without resurfacing (either because the boy had accidentally struck his head or because of an epileptic seizure), falsely informed his friends in response to their cries to help the victim that he was in fact swimming away, and abandoned the drowning boy to die.

Second, although we have reversed depraved indifference murder convictions in most cases involving isolated attacks, we have held that the crime is nevertheless established when a defendant-acting with a conscious objective not to kill but to harm-engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim. When a defendant's actions serve to intensify or prolong a victim's suffering, they bespeak a level of cruelty that establishes the depravity mandated by statute. Thus, in *People v. Poplis*[, 30 N.Y.2d 85 (1972)], the defendant committed depraved indifference murder when, albeit without any intent to kill, he caused the death of a 3 1/2-year-old infant as a result of continually beating the child over a period of five days (*see also People v. Best*, 85 N.Y.2d 826 [(1995)], . . . [defendant's repeated severe beatings of her nine-year-old son caused large open wounds resulting in blood poisoning and ultimately death by asphyxiation; depraved indifference murder

16

established since defendant continued beatings though aware of child's condition] ).

> Both of these categories of cases reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts.   We have also upheld convictions for depraved indifference murder in a few other extraordinary cases involving conduct that endangered only one person, where the evidence showed not just recklessness, but depraved indifference to human life (*see e.g. People v. Roe*, 74 N.Y.2d 20 [1989] [defendant fired at point-blank range without knowing whether the bullet was a "live" or "dummy" round]).

*Id.* at 12-14. The court concluded that "[w]here comparable facts are not shown . . . a jury is foreclosed, as a matter of law, from considering a depraved indifference murder charge whenever death is the result of a one-on-one confrontation." *Id.* at 14.

The court believed that this restrictive view of depraved-indifference murder was consistent with its holding in *Register* that the depraved-indifference murder statute "requires in addition not only that the conduct which results in death present a grave risk of death but that it also occur '[u]nder circumstances evincing a depraved indifference to human life.'" *Id.* at 17 (quoting *Register*, 60 N.Y. 2d at 276). The *per curiam* "ma[de] clear," however, that this additional requirement "comprise[d] both depravity *and* indifference," meaning "beyond mere recklessness and risk[.]" *Id.* at 16 (emphasis added).

In *Register*, where the court held that intoxication is not a defense to depraved-indifference murder, it explained that the additional requirement, "[i]f it states an element of the crime at all, . . . is not an element in the traditional sense but rather a

17

definition of the factual setting in which the risk creating conduct must occur -- objective circumstances which are not subject to being negatived by evidence of defendant's intoxication[,]" *Register,* 60 N.Y.2d at 276, and viewed the risk-creating conduct as "a *very* substantial risk" in contrast to "the substantial risk present in manslaughter[.]" *Id.* at 277 (emphasis in original).[7] The court thereafter reiterated this *formulation* in *Sanchez,* linking the degree of risk to the objective assessment of the defendant's conduct. *See* 98 N.Y.2d at 379-80 ("[C]ircumstances evincing a depraved indifference to human life . . . focuses not on the subjective intent of the defendant, 'but rather upon an objective assessment of the degree of risk presented by [the] defendant's reckless conduct.'" (quoting *Register,* 60 N.Y.2d at 277)).

In *Suarez,* however, the court chose to "*depart slightly* from the *Register* formulation" to "make clear that the additional requirement of depraved indifference has meaning independent of the gravity of the risk[,]" *Suarez,* slip op. at 17 (emphasis added), and concluded:

> In sum, whether a small, finite or rare category, depraved indifference murder should not be routinely charged to a jury. Focus on the three statutory factors that distinguish depraved indifference murder -- 'circumstances evincing a depraved indifference to human life,' recklessness and 'a grave risk of death to another person' -- should again make clear that the statute properly applies only to the unusual case.

---

[7] In *Register,* the court, after rejecting the intoxication defense, upheld a depraved-indifference murder conviction where the defendant shot and killed one man and seriously injured two others in a packed barroom after a series of arguments with patrons; the person he killed was simply walking by the defendant and there was no apparent reason why the defendant shot him.

18

*Id.* at 18. In light of the explication in *Suarez* of the proper application of depraved-indifference murder, Guzman's conviction would have to be reversed if this were the applicable law governing the resolution of his *habeas* petition since the two cases which were reversed in *Suarez* are conceptually indistinguishable from the present case, each involving, as here, a one-on-one knifing devoid of the unusual circumstances that would warrant a depraved-indifference murder conviction: In *People v. Suarez*, the defendant had stabbed his girlfriend three times -- in the throat, chest and abdomen -- and the victim bled to death; the defendant asserted a justification defense, alleging that the victim had lunged at him with a knife and testified that he did not intend to kill her. The court held that this "did not, as a matter of law, constitute depraved indifference murder" because "[w]hether [defendant] intended to kill her or merely to cause her serious injury -- and either of these findings, supported by sufficient evidence, might have been properly made by the jury -- defendant's actions in no way reflected a depraved indifference to her fate." *Id.* at 19. In *People v. McPherson*, the defendant stabbed the father of her child once in the chest following an argument over child support; the defendant also asserted a justification defense, alleging that the victim had raised his hand as if to hit her. The court simply noted that although "defendant's conduct may have reflected recklessness, [it] did not fall within the small, and finite, category of cases evidencing utter depravity, uncommon brutality and inhumane cruelty required for depraved indifference murder[,]" *id.*; that is, the evidence supported manslaughter but not depraved-indifference murder.

19

The Court gleans from its reading of the three additional opinions in *Suarez* that Guzman's conviction would have to be reversed based on the applicable law at the time the Appellate Division affirmed the conviction, but not at the time of conviction.

In their joint concurrence, Judges G.B. Smith, Rosenblatt and R.S. Smith viewed the court's earlier decisions in *Register* and *Sanchez*, "which was based in significant part on *Register*," to have given "too expansive a definition to depraved indifference murder[,]" and opined that the court "properly limited the force of those decisions in *People v. Hafeez* (100 N.Y.2d 253 [2003]), *People v. Gonzalez* (1 N.Y.3d 464 [2004]) and *People v. Payne* (3 N.Y.3d 266 [2004])." *Suarez*, slip op. at 1 (G.B. Smith, Rosenblatt, R.S. Smith, J.J., concurring). They also viewed *Suarez* as "limit[ing] [*Register* and *Sanchez*] even further" and, "tak[ing] a step beyond the per curiam opinion[,]" stated "what the Court stops short of saying: that *Register* and *Sanchez* should be explicitly overruled." *Id.* Nonetheless, they "expect[ed], or at least hope[d], that the rule embodied in this and our other recent decisions will be applied prospectively, and that any impact on already completed prosecutions can be avoided[,]" *id.*, commenting that "[d]efendants who committed vicious crimes but who may have been charged and convicted under the wrong section of the statute are not attractive candidates for collateral relief after their convictions have become final." *Id.*

The "other recent decisions" obviously refer to the three judges' references in their joint concurring opinion to *Hafeez* and *Gonzalez*, each of which was decided after *Sanchez*, but before Guzman's conviction was affirmed by the Appellate Division, and to

20

*Payne*, which was decided after leave to appeal was denied but before the conviction became final.[8]

In her separate concurring opinion, Judge Read concurred with the result in *People v. Suarez* on "constraint" of the court's decision in *Payne*, and concurred with the result in *People v. McPherson* on "constraint" of *Hafeez* and *Payne*, *Suarez*, slip op. at 1 (Read, J., concurring); nonetheless, "[f]or all the reasons expressed by Judge Graffeo" in her dissent, she found "the majority's rationale for deviating from our longstanding precedent and reinterpreting article 125 to be unconvincing." *Id.* at 1-2.

Judge Graffeo concurred in *McPherson* and dissented in *Suarez*, and opined that the majority's decision "deviate[d] from [the court's] precedent in *Sanchez*, *Register*, and other cases decided by this Court," signaling "a fundamental shift in our homicide jurisprudence." *Suarez*, slip op. at 1, 6 (Graffeo, J., concurring in part and dissenting in part). With respect to *Suarez*, she explained that the jury could have credited the defendant's testimony that he did not intend to kill the victim and that "defendant's actions created such an exceptionally high, grave risk of death that it was properly classified as depraved indifference murder rather than manslaughter." *Id.* at 17. By contrast, in *McPherson*, she concurred that the defendant's actions could be properly classified as

---

[8] *Sanchez* was decided on July 9, 2002. Since leave to appeal was denied on September 24, 2004, Guzman's conviction became final on December 24, 2004, when the 90-day period to file a petition for *certiorari* to the Supreme Court expired. *See* Sup. Ct. R. 13. In between, *Hafeez* was decided on June 10, 2003 (one year before the Appellate Division denied Guzman's insufficiency claim on June 28, 2004); *Gonzalez* was decided on March 24, 2004 (three months before the Appellate Division's decision); *Payne* was decided on October 19, 2004 (one month after leave to appeal was denied).

manslaughter but not depraved-indifference murder because there were no objective circumstances evidencing a depraved indifference to human life: the defendant inflicted a single stab wound in the midst of an escalating argument, called 911 and remained with the victim until assistance arrived. *See id.*

Since in their joint concurring opinion the three judges viewed *Hafeez*, *Gonzalez* and *Payne* as limiting the force of *Register* and *Sanchez*, the Court assumes that they would conclude that those three cases reflect the applicable law at the time when Guzman's case was on direct review; so too, presumably, would Judge Read, based upon her begrudging reliance on *Hafeez* and *Payne* in her concurring opinion -- compelling her to conclude on constraint of those decisions that neither Suarez's nor McPherson's conduct could support a conviction for depraved-indifference murder. As explained below, the Court's view of *Hafeez*, *Gonzalez* and *Payne* leads it to conclude that they would require the granting of Guzman's *habeas* petition if the law at the time of direct review were determinant.

### ii. *Hafeez*, *Gonzalez* and *Payne*

In *Hafeez*, the defendant was found guilty of depraved-indifference murder under an accomplice theory of liability for aiding and abetting his codefendant's revenge killing. The codefendant "plotted his revenge for months in advance and effectuated his plan on the night of the stabbing by a scheme intended to place the victim in a position where he would be vulnerable to attack." *Hafeez*, 100 N.Y.2d at 258. The codefendant "concealed a knife in his sleeve poised to slip into his hand" and used it to inflict "a single

deliberate wound to the chest that perforated the victim's heart." *Id.* The court held this to be "a quintessentially intentional attack directed solely at the victim[,]" which was "consistent with intentional murder as opposed to depraved indifference murder." *Id.* (internal citation omitted).

The court noted that under *Register*, in order to qualify for depraved-indifference murder, the People had to show "that defendant's acts were 'imminently dangerous and presented a very high risk of death to others.'" *Id.* at 259 (quoting *Register*, 60 N.Y.2d at 274). As the court explained: "That burden was met in *Sanchez*, which involved the sudden shooting of a victim by a defendant who reached around from behind a door and fired into an area where children were playing, presenting a heightened risk of *unintended* injury"; by contrast, "the actions of both defendants were focused on first isolating, and then *intentionally* injuring, the victim." *Id.* (emphasis added). The court consequently retreated from the *Register/Sanchez* formulation by focusing on the extenuating circumstances of exposing others to "unintended injury" rather than on the conduct that created the grave risk; therefore, implicit in the court's holding in *Hafeez* is that a defendant who engages in intentional conduct – but not necessarily an intentional killing – and in so doing creates a grave risk of harm, may not be found guilty of depraved-indifference murder unless there is some other extenuating circumstance present, such as exposing others to unintended injury.

Judge Read, in dissent, disagreed that there was no rational view of the case to support depraved indifference murder since there was evidence the jury could have

credited that defendant and the codefendant never intended to kill the victim, but simply "lured [him] out of a bar . . . to beat him" up. *Id.* at 261. She emphasized that the court had never previously "intimated that a conviction for depraved indifference murder [could] stand only if the defendant had not intended to injure the ultimate victim[ ]"; rather, the court has repeatedly "upheld depraved indifference murder convictions where there may have been intent to injure the victim so long as the defendant did not have a conscious objective to cause [death]." *Id.* at 263 (citations and quotations omitted).

In a brief concurring opinion, Judge Rosenblatt "applaud[ed]" the majority's opinion for "limiting *Sanchez* by properly rejecting the incongruous notion that an intentional killing can reflect depraved indifference," noting that it is "reassuring, therefore, that there are now six Judges of this Court who recognize that even under *Sanchez* (with whom I have disagreed) depraved indifference murder does have its limits." *Id.* at 260.

In *Gonzalez*, the court similarly recast *Sanchez* when it unanimously upheld the defendant's conviction for intentional murder where he shot the victim in a barbershop twice before the victim fell to the floor, and a total of eight more times, collectively, in the head and back as the victim lay prone on the floor, after which he waived his gun at the only eyewitness -- the barber -- and warned him not to say anything, before the defendant walked out the door. The court explained that in *Sanchez* the defendant created a "heightened risk of unintended injury" by "fir[ing] into an area where children were playing," *Gonzalez*, 1 N.Y.3d at 468 (quoting *Hafeez*, 100 N.Y.2d at 259), thereby

"establish[ing] his indifference to the grave risk of death posed by his actions." *Id.* In *Gonzalez*, by contrast, the only conclusion reasonably supported by the evidence was that the defendant shot to kill his intended victim, and "[w]hen a defendant's conscious objective is to cause death, the depravity of the circumstances under which the intentional homicide is committed is simply irrelevant." *Id.* at 469.

The court drew the same distinction in *Payne* in reversing a depraved-indifference murder conviction where there was a point-blank shooting after the victim did not heed the defendant's advice never to communicate with defendant's girlfriend. *See Payne*, 3 N.Y.3d at 271. It explained that its recent holdings in *Gonzalez* and *Hafeez*, as well as *Sanchez*, "have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York[,]" *id.* at 270. Significantly, in stating what it thereafter repeated in *Suarez* - that "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder[,]" *id.* at 272, the court expressly "differentiated cases like the one before [it] (and *Gonzalez*) from homicides [as in *Sanchez*] in which a defendant . . . shoots into a crowd or otherwise endangers innocent bystanders." *Id.* at 271.

Notably, in *Suarez*, the *per curiam* opinion reinforced the distinction which it drew in *Gonzalez* and *Payne* that the depraved-indifference murder was upheld in *Sanchez* "because 'others were endangered.'" *Suarez*, slip op. at 14-15 n.7 (quoting *Payne*, 3 N.Y.2d at 272). Specifically, in respect to *Gonzalez*, it explained that "the evidence was legally insufficient to establish depraved indifference murder despite the presence of the barber

25

in the shop at the time of the shooting" because "the mere presence of third persons at the scene of a killing does not convert an intentional homicide directed at a particular victim into depraved indifference murder unless others are *actually endangered*." *Id.* (emphasis in original).[9]

Based on its reading of *Hafeez*, *Gonzalez* and *Payne*, the Court would be compelled to grant Guzman's *habeas* petition if the law applicable during direct review were controlling.[10] Plainly, there are no other circumstances, as envisioned under those cases, to allow the Court to conclude that this one-on-one knifing could be considered under any view of the evidence as a depraved-indifference murder; it does not fall within the two narrow lines of exceptional cases collated by the court in *Suarez*, and, unlike *Sanchez* and like *Gonzalez*, the only person actually endangered was the victim. Thus, under this view of the law, the Appellate Division's application of *Jackson v. Virginia* would, as a matter of law, have been objectively unreasonable because, under any reasonable view

---

[9] In her dissent in *Suarez*, Judge Graffeo takes exception to "[t]he majority['s] attempt[ ] to reconcile its decision with the principles articulated in *Sanchez* by stating that the depraved indifference murder conviction in that case was upheld only because others were endangered," *Suarez*, slip op. at 9 (concurring in part and dissenting in part) (internal citations and quotations omitted), since "the *Sanchez* opinion neither relied on danger to multiple individuals as a decisive factor supporting a finding of depraved indifference, nor suggested that such a fact was crucial to its reasoning." *Id.*

[10] Even if the Court were to assume that Guzman's conviction became final when the Court of Appeals denied leave to appeal, rather than after the 90-day *certiorari* period expired (an issue the Court need not reach), it would nevertheless be appropriate to consider *Payne* since it did not create new law but simply applied new facts to the articulation of the law under *Hafeez* and *Gonzalez*. *See Policano*, 430 F.3d at 92 (recognizing principle that subsequent cases may be considered to the extent that they apply new facts to old law).

26

of the case, there was insufficient evidence to support its finding that the petitioner was guilty of depraved-indifference murder.[11]

However, the Court would hold otherwise if the applicable law were to date back to the time of conviction in 2000 because it was not until *Hafeez, Gonzalez* and *Payne* that the New York Court of Appeals limited the force of *Register*, which was the applicable law at the time of Guzman's trial. Under *Register*, it was not improper for the trial court to have permitted the jury to decide whether Guzman could be convicted of depraved-indifference murder since, although the law admittedly required, even at that time, "an objective assessment of the degree of risk presented by [the] defendant's reckless conduct," *Register*, 60 N.Y.2d at 277 (citations omitted), the focused inquiry was nonetheless on the degree of risk to the specific victim, and not necessarily as to whether others were endangered; therefore, under the facts of the present case, the jury was entitled to determine that Guzman's conduct created a "grave risk" to the victim, short of "a virtual certainty of death born of an intent to kill," *Policano*, 430 F.3d at 89 (citation and quotations omitted), warranting its verdict of depraved-indifference murder.

### d. Retroactivity of New York Law

The Court's foray into New York law does not stop with ascertaining the law

---

[11] In light of the absence of any evidence to support depraved-indifference murder, the Appellate Division's determination could not be viewed as simply erroneous or incorrect. To do so under the facts of this case would take the "increment [of incorrectness beyond error]," which would limit *habeas* relief "to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski*, 321 F.3d at 125 (internal citation omitted).

at the time of conviction and during the time of appellate review; it must also determine whether New York courts would retroactively apply *Hafeez, Gonzalez* and *Payne*. This determination is necessary as antecedent to the Court's ultimate determination as to whether retroactivity would be constitutionally required should it be determined that under New York law *Hafeez, Gonzalez* and *Payne* would not be retroactively applied. *See Chapman v. LeMaster*, 302 F.3d 1189, 1198 (10th Cir. 2002) (explaining that "when no state appellate court has addressed the retroactivity issue and the federal due process claim is intertwined with the antecedent issue of state law, it is appropriate for a federal *habeas* court to address the state law question to resolve the federal constitutional claim." (citations omitted)).

Under New York law, once a conviction has become final, a new rule will not be retroactively applied "absent manifest injustice." *People v. Pepper*, 53 N.Y.2d 213, 222 (1981). This would be the applicable standard to determine whether *Suarez* should be retroactively applied since it was decided one year after Guzman's conviction became final. However, whether *Hafeez, Gonzalez* and *Payne* is to be retroactively applied is governed by evaluating three factors applicable to new rules that are established during direct review. *See People v. Hannigan*, 601 N.Y.S.2d 928 (2d Dep't 1993) (conducting retroactivity analysis even though new rule was announced by Court of Appeals before the Appellate Division ruled on defendant's direct appeal). These factors are "(1) the purpose to be served by the new rule; (2) the extent of reliance on the old rule; and (3) the effect on the administration of justice of retroactive application." *See Mitchell v. Casiano*, 80 N.Y.2d 519, 526 (1992)

(quoting *Pepper*, 53 N.Y.2d at 220).

Although the proper inquiry, therefore, "is to determine whether the conviction was obtained in violation of the defendant's rights as defined by the law at the time of the conviction or by present law which is properly applied to it under recognized principles of retroactivity[,]" *People v. Catalanotte*, 72 N.Y.2d 641, 643 (1988), this inquiry presupposes the advent of a new rule of law. *People v. Hill*, 85 N.Y.2d 256 (1995), drives home the point. As explained in *Hill*, on the same day the Appellate Division affirmed the defendant's conviction for criminal possession of a controlled substance in the second degree, the State's high court had decided *People v. Ryan*, 82 N.Y.2d 497 (1995), holding that knowledge of both the possession of the substance and its weight are required for conviction. Since the jury was not so charged in *Hill*, the conviction was reversed. The court rejected the People's argument that reversal was not required because the trial was conducted prior to the court's decision's in *Ryan*. It reasoned that "[s]ince *Ryan* construed the words of a statute, it established no new legal principle"; rather, *Ryan* simply discerned that the Legislature intended that knowledge of both possession and weight be elements of the crime. *Id*. at 262. Additionally, the court held that "a finding of guilt of violating a statute even though one of the elements of the crime had not been established in the circumstances would have rendered the proceeding fundamentally unfair and a violation of due process." *Id*.

The holding in *Hill* is simply that a conviction cannot stand if an element of the crime at the time of trial has not been established when the element is subsequently

judicially defined for the first time. As the Supreme Court thereafter held in *Fiore v. White,* 531 U.S. 225 (2001), no issue of retroactivity is implicated, even after a conviction has become final, where a state court, rather than creating a new law, simply clarifies the elements of a criminal statute under which a conviction has been obtained since "the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." *Id.* at 228-29.

Do *Suarez,* as well as *Hafeez, Gonzalez* and *Payne,* represent cases more akin to *Hill* and *Fiore,* where the elements of a crime are clarified subsequent to conviction, or are they more like cases signaling "a fundamental shift in [the State's] homicide jurisprudence" -- which is how Judge Graffeo referred to the *per curiam* opinion in *Suarez? Suarez,* slip op. at 6 (Graffeo, J., concurring in part and dissenting in part). Or are they somewhere in between, but nonetheless qualifying as new law requiring application of the State's retroactivity rules?

At least five of the judges of the Court of Appeals would view *Suarez* as creating new law; Judge Graffeo has explicitly so stated, the three-judge concurrence considers *Register* and *Sanchez* as having been overruled, and Judge Read's concurrence suggests that she would agree. Conceptually, it is difficult to conclude that they would view *Hafeez, Gonzalez* and *Payne* in a significantly different light. The Court reads those cases as holding that cases like Guzman's can never as a matter of law be charged as depraved-indifference murder -- and hence never can be submitted to a jury -- a significant change in the law compared to this Court's view of the law as of the time of Guzman's

conviction. All that *Suarez* did by "mak[ing] clear that . . . depraved indifference has meaning independent of the gravity of the risk," was to reinforce that "the statute properly applies only to the unusual case," *Suarez*, slip op. at 17 (per curiam), which was precisely how *Hafeez, Gonzalez* and *Payne* "limited the force" of *Register and Sanchez. Suarez*, slip op. at 1 (G.B. Smith, Rosenblatt, R.S. Smith, J.J., concurring). The Court will, therefore, apply New York's retroactivity rules.

As for *Suarez*, it cannot be said that it would be manifestly unjust if it were not applied retroactively to the time of conviction; even if the jury had been given the choice of first-degree murder or first-degree manslaughter, it is certainly not unjust, let alone manifestly unjust, to keep a murderer in jail. As for *Hafeez, Gonzalez* and *Payne*, the analysis of the three factors applicable to cases under direct review should not produce a different retroactivity result.

In considering these factors, "the extent of the reliance and the nature of the burden on the administration of justice are of substantial significance only when the answer to the retroactivity question is not to be found in the purpose of the new rule itself." *Hill*, 85 N.Y.2d at 263 (quoting *Pepper*, 53 N.Y.2d at 220). Clearly, the purpose of the new rule was not to let murderers go free because they were "convicted under the wrong section of the statute." *Suarez,* slip op. at 2 (G.B. Smith, Rosenblatt, R.S. Smith, J.J., concurring). As for the "nature of the burden on the administration of justice," it has already been sufficiently taxed by letting too many murderers go unpunished, such as Policano, Suarez, McPherson, Hafeez, Gonzalez and Payne. Unless the Court's view of

31

New York law is incorrect, Guzman need not be added to that notorious list, and the expectations and hopes of the three judges in their joint concurring opinion - "that the rule embodied in [*Suarez*] and [*Hafeez, Gonzalez* and *Payne*] will be applied prospectively, and that any impact on already completed prosecutions can be avoided" - will be realized. *Id.*

This, however, is not the end of the case. Since AEDPA deference applies, the Court must also decide whether the failure to retroactively apply a new criminal rule of state law would violate clearly established Supreme Court law.

**e. Relevant Supreme Court Law**

The Supreme Court has never addressed this issue. In *Griffith v. Kentucky*, 479 U.S. 314 (1987), the Supreme Court was faced with the issue of whether *Batson* v. *Kentucky*, 476 U.S. 79 (1986), should be applied "to litigation pending on direct state or federal review or not yet final when *Batson* was decided." *Griffith*, 479 U.S. at 317. In answering in the affirmative, the Court held that "the failure to apply a newly declared *constitutional* rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." *Id.* at 322 (emphasis added). In so holding, it rejected the argument that there should be an exception carved out for cases that constitute a "clear break" with past constitutional precedent. *Id.* at 325. In doing so, it stated that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328.

The failure of the Supreme Court to state that its holding applies *only* to new

32

*constitutional* rules has created some confusion. For example, some federal courts have applied *Griffith* to new constructions of federal criminal statutes. *See, e.g., United States v. Mauldin*, 109 F.3d 1159, 1161 (6th Cir. 1997) (commenting that *Griffith* required the court to apply the Supreme Court's holding that narrowed the meanings of "use" and "carry" of a firearm in relation to a drug trafficking offense, under 18 U.S.C. § 924(c)(1) to cases that were not yet final); *United States v. Rivas*, 85 F.3d 193, 195 n.1 (5th Cir. 1996) (same). However, two circuit courts have held that *Griffith* only applies to constitutionally mandated procedures. *See Diggs v. Owens*, 833 F.2d 439, 442 (3rd Cir. 1987) (*"Griffith . . . dealt with constitutionally mandated procedures. . . .* Accordingly, we hold that *Griffith* should be confined to constitutional rules of criminal procedure and thus does not require retroactive application of new procedural decisions not constitutionally grounded." (internal citations and quotations omitted)); *Mason v. Duckworth*, 74 F.3d 815, 818 (7th Cir. 1996) (*"Griffith* only applies to new rules of federal constitutional magnitude." (internal citations omitted)).

Moreover, the New York Court of Appeals has construed *Griffith* as not requiring it to apply new rules of state law retroactively to cases pending on direct review. Thus, in *Mitchell v. Chambers*, the court adhered to its three-factor retroactivity rule under *Pepper*, commenting, in rejecting the defendant's position that it was bound by *Griffith*: "If no Federal constitutional principles are involved . . . the question of retroactivity is one of State law. The Supreme Court has no concern with the uniformity of our law and if only a local question is presented, the state courts generally have the authority to determine the

33

retroactivity of their own decisions." 80 N.Y.2d at 526 (internal citation omitted).

In *Fiore*, however, the Supreme Court granted *certiorari* in part "to decide when, or whether, the Federal Due Process Clause requires a State to apply a new interpretation of a state criminal statute retroactively to cases on collateral review." 531 U.S. at 226. In order to make that determination, it first asked the state's high court to tell it whether a prior decision of that court was the correct interpretation of that state's law "at the date Fiore's conviction became *final*[,]" *id.* at 228 (emphasis added), thereby suggesting that a state should apply a new judicial construction of a state criminal statute to cases that are pending on direct review. When the state replied that its holding simply clarified the law as it existed at the time of conviction, the retroactivity issue was rendered academic. To date, the retroactivity question posed by *Fiore* remains unanswered; moreover, despite the reference to the finality of a conviction in *Fiore*, it is at best *dicta* since there is no Supreme Court case holding that a state court cannot decide whether a new state law, not impacting the Constitution, should be applied retroactively to the date of conviction.

Since there is no Supreme Court holding addressing the issue of whether the states must retroactively apply a new criminal rule of state law, it cannot be concluded under AEDPA that the Appellate Division's rejection of Guzman's insufficiency claim was contrary to clearly established Supreme Court precedent. *See McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003) ("[c]learly established Federal law includes only holdings of Supreme Court decisions and does not include dicta" (internal citations and quotations omitted)). Guzman is not, therefore, entitled to *habeas* relief on his insufficiency claim because the

state court "result" was not contrary to or an unreasonable application of clearly established Supreme Court law. *Bell*, 236 F.3d at 149.

## B. Juror Instructions

In his claim regarding juror instructions, Guzman argues that the trial court unfairly (1) marshaled the evidence, (2) refused to instruct the jury in regard to flight and (3) refused to provide the pattern jury instruction on impeachment by bias and prejudice. In reviewing an allegedly improper jury charge, the Court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

### 1. Marshaling of Identification Evidence

Viewing the trial court's instructions as a whole, the trial court's marshaling of the evidence did not rise to a due process violation. The trial court both outlined the testimony that the prosecution elicited in regard to the identification of Guzman as the stabber and noted the defense's arguments about the flaws in the prosecution's case; furthermore, the trial court clearly stated that the jury were "the sole judges" of whether Guzman was the perpetrator, Tr. at 589, repeatedly reminded the jury that Guzman was presumed innocent, and never opined about its view of the evidence. *See Brown v. Greiner*, 2003 WL 22964395, at *4-7 (E.D.N.Y. Oct. 2, 2003) (Weinstein, J.) (upholding similar charge on *de novo* review).

### 2. Flight

Guzman argues that the trial court, which informed the jury that Guzman's

35

flight was further evidence of his guilt, should have reminded the jury that there were alternative reasons for flight; he does not argue that there was insufficient evidence to warrant the flight instruction. Although New York courts have "recognized the ambiguity of evidence of flight and insisted that the jury be closely instructed as to its weakness as an indication of guilt of the crime charged[,]" *People v. Yazum*, 13 N.Y.2d 302, 304 (1963), the trial court's failure to provide the instruction did not so infect the entire trial process that the resulting conviction violated Guzman's due process rights, *see Ocasio v. Artuz*, 2002 WL 1159892, at *8 (E.D.N.Y. May 24, 2002); *Cherry v. Hoke*, 1990 WL 52274, at *1 (S.D.N.Y. Apr. 19, 1990); in any event, in light of the ample evidence of Guzman's guilt, any error was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993) (error harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict").

### 3. Impeachment

There was no error in the trial court's failure to provide the requested pattern-jury instruction on impeachment because the trial court gave the jury an impeachment instruction that did not differ from the requested instruction in any material manner.

### C. Fourth Amendment

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.*

at 494-95. Thus, *Stone* bars *habeas* review of claims that evidence seized should have been suppressed as fruit of an illegal arrest. *See Pina v. Kuhlmann*, 239 F.Supp. 2d 285, 289 (E.D.N.Y. 2003) ("It is well settled that [Fourth Amendment] claims are not cognizable for habeas corpus review where a State has provided a full and fair opportunity to litigate this issue."). Following *Stone*, review of Fourth Amendment claims in *habeas* petitions is permissible only: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

New York has a corrective procedure for Fourth Amendment violations, which is facially adequate. *See id.* at 70 n.1. Indeed, Guzman availed himself of that procedure by making a motion to suppress, which the trial court denied after a hearing, and by appealing that denial. Further, having reviewed the record, the Court concludes that there was no unconscionable breakdown in the underlying process. Guzman's Fourth Amendment claim for *habeas* relief is, therefore, barred by *Stone*.

**D. Identification**

With respect to his identification claim, Guzman contends that the Due Process Clause required the trial court to exclude Michael Huayamave's testimony pertaining to his identification of Guzman as the stabber; Guzman argues that the showup at which Huayamave identified Guzman was suggestive. Due process requires that

testimony from an eyewitness identifying the witness as the perpetrator of a crime be "reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), for the proposition that "reliability is the linchpin in determining the admissibility of identification testimony"). Reliability is assessed by considering "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir. 1992) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Based on its review of the record, the Court concludes that Huayamave's identification was sufficiently reliable: He witnessed the entire duration of the stabbing, the showup occurred within a short time of the commission of the crime and he expressed no hesitation in his identification. *See, e.g., United States v. Mohammed*, 27 F.3d 815, 822 (2d Cir. 1994) ("The fact that [the eyewitness] closely observed [the defendant] for approximately thirty seconds from a short distance and had no hesitancy in identifying him only ten minutes later strongly supports the conclusion that the identification was reliable."); *Chavis v. Henderson*, 638 F.2d 534, 536-37 (2d Cir. 1980) (upholding identification where witness made identification close in time and without hesitation).

## E. Ineffective Assistance of Trial Counsel

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that counsel's representation "fell below an objective standard of reasonableness" based

on "prevailing professional norms," and that "there is a reasonable probability that, but for

counsel's unprofessional errors; the result of the proceeding would have been different."

*Id.* at 688, 694. Guzman raises a host of bases for his claim that his trial counsel was

ineffective. The Court need only address his claims based on his counsel's failure (1) to

litigate the government's violation of the Vienna Convention on Consular Relations

("VCCR"), and (2) to argue that the crime of depraved-indifference murder was

unconstitutionally vague; Guzman's remaining alleged errors were part of Guzman's

counsel's trial strategy and do not amount to ineffective assistance. *See, e.g., United States

v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999) ("[A]ctions or omissions that might be considered

sound trial strategy do not constitute ineffective assistance.").

## 1. VCCR

Article 36(1)(b) of the Vienna Convention provides that when "a national of

[another nation] is arrested or committed to prison or to custody pending trial or is

detained in any other manner[,]" the United States upon request "shall, without delay,

inform the consular post of [that nation]." Circuit courts, however, have held that a

violation is neither a basis to dismiss an indictment, *see, e.g., United States v. De La Pava*, 268

F.3d 157, 165 (2d Cir. 2001), nor a basis to suppress evidence. *See United States v. Lombera-

Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000) ("[T]he exclusion in a criminal prosecution of

evidence obtained as the result of post-arrest interrogation is not [a remedy for a VCCR

violation]."); *United States v. Li*, 206 F.3d 56 (1st Cir. 1000) (same). Accordingly, Guzman

cannot establish either *Strickland* prong, *see De La Pava*, 268 F.3d at166 (rejecting similar

ineffective assistance claim on both prongs of *Strickland*); thus, the state court's analysis regarding Guzman's counsel's failure to raise the VCCR violation was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## 2. Constitutionality of Depraved-Indifference Murder

Guzman's claim based on his counsel's failure to argue that the depraved indifference statute was unconstitutionally vague is similarly without merit. Courts have repeatedly upheld the constitutionality of the statute. *See, e.g., Mannix v. Phillips*, 390 F. Supp. 2d 280, 292 (S.D.N.Y. 2005); *see also People v. Johnson*, 87 N.Y.2d 357 (1996); *People v. Cole*, 85 N.Y.2d 990 (1995).

## CONCLUSION

The petition is denied, but a certificate of appealability is issued on Guzman's insufficiency claim, and counsel will be assigned forthwith to protect Guzman's right to file a Notice of Appeal. Unfortunately, unlike the Second Circuit, which has the power to certify issues of New York law to the New York Court of Appeals, *see* N.Y. Court Rules, Court of Appeals, § 500.17(a); Second Circuit Local Rule § 0.27, district courts in this circuit have no choice but to be in the business of deciding difficult state law issues. *See Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 71 n.6 (2d Cir. 2003) (noting that district court lacks authority to certify a question of state law to the New York Court of Appeals). The present case is a classic example of the lengths to which a district court must go in discharging this responsibility when the applicable state law is anything but clear, requiring the Court to make its best educated guess as to how the New York Court of

Appeals would answer the questions which the Court believes are dispositive of the present *habeas* petition, if asked by the circuit court, namely: (1) what was the status of the law of depraved-indifference murder at the time of Guzman's conviction; (2) had the law changed at the time of Guzman's direct appeal; (3) if so, is the new law to be applied retroactively to the date of conviction.[12]

        **SO ORDERED.**

FREDERIC BLOCK<br>
United States Senior District Judge

Dated:       Brooklyn, New York<br>
               March 15, 2006

---

[12] The Court notes that in *Policano*, in citing to cases decided after Policano's trial because they explained and reaffirmed the principles of New York law, the circuit court referred to them as "clearly established." *Policano*, 430 F.3d at 88 n.1. Since the concept of "clearly established" under AEDPA refers to clearly established Supreme Court law, the Court cannot employ AEDPA as a means to avoid deciding unclear state law.